UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

ELIYAHU WEINSTEIN,
   *Petitioner*,

   v.

UNITED STATES,
   *Respondent*.

Civil Action No. _____

## AFFIDAVIT OF ELIYAHU WEINSTEIN

I, Eliyahu Weinstein, state as follows:

1. I am the Petitioner in this action pursuant to 28 U.S.C. § 2255.

2. On August 11, 2010, I was charged with fraud and other crimes in a federal criminal complaint filed in the U.S. District Court for the District of New Jersey. On August 30, 2010, I was released on conditions.

3. From the outset, I worked to retain Attorney Robert Cleary of Proskauer Rose LLP ("Proskauer") to represent me. I also consulted with Attorney David Schoen, a solo practitioner, about the criminal case and various civil matters.

4. In one of my first meetings with Attorney Cleary, I met his partner, Attorney Mark Harris. I immediately felt a special affinity for Attorney Harris because we are both Orthodox Jews and shared many acquaintances in common. Over time, Attorney Harris and I developed an intimate friendship and relationship of trust. Attorney Harris met with my rabbinical advisors, socialized with my friends

1

and family (including my wife, children, siblings, and parents), and attended my son's bar mitzvah.  I also met Attorney Harris's family.

5. Attorneys Cleary and Harris led me to believe that, as the former U.S. Attorney for New Jersey, Attorney Cleary could influence the U.S. Attorney's Office to dismiss the case, resolve it on favorable terms, or obtain an acquittal at trial.

6. During a meeting early in the case at Attorney Cleary's home in Princeton, New Jersey, he told me that Proskauer would require a $1 million "evergreen" retainer for him to appear in the case and that the representation could cost over $3 million in all.

7. I could not afford the retainer that Proskauer required for Attorney Cleary to appear on my behalf as counsel of record.  Nevertheless, over the ensuring two-plus years, Attorneys Cleary and Harris provided ongoing legal advice to me, and I paid substantial amounts of money (several hundred thousand dollars) to Proskauer for that advice.

8. During that time, Attorney Harris encouraged me to engage in various business transactions to raise money to pay a sufficiently large retainer for Proskauer to enter the case as counsel of record.

9. For example, in February 2011, Attorney Harris introduced me to his close friend, Attorney Ira Lipsius.  Attorney Harris described Attorney Lipsius as an insurance law expert.  Attorneys Harris and Lipsius discussed with me how to structure a potential life insurance transaction with Morris Rotenstein, an alleged victim in the case against me who had previously lost money that he invested with

2

me. The purposes of the life insurance transaction were to repay Rotenstein and, at the same time, to generate funds to pay Proskauer.

10. Despite these and other attempted transactions, I was not able to come up with enough money to pay Proskauer to appear in the case. However, I continued to look to Attorneys Cleary and Harris for advice and paid them for their time.

11. On July 22, 2011, I retained Attorney Henry Klingeman to represent me as counsel of record in the case. On September 23, 2011, Attorney David Schoen formally appeared in the case as co-counsel to represent me together with Attorney Klingeman.

12. On October 27, 2011, I was indicted.

13. In early November 2012, the government tendered a written plea offer. It entailed a plea of guilty to charges of wire fraud and money laundering and would result in a sentence of between 5 and 10 years in prison and restitution in the amount of $14,750,609.

14. Attorneys Klingeman and Schoen engaged in extensive negotiations with the government to modify certain terms of the agreement and worked with me on a factual allocution that I could make in connection with the plea.

15. By Friday, November 9, 2012, I was comfortable in principle with the negotiated language of the plea agreement.

16. Both Attorneys Schoen and Klingeman strongly advised me to accept the 5-to-10-year plea offer. At Attorney Klingeman's request, I signed the plea

agreement so that he would be able to provide it to the government upon my authorization.

17. On Friday, November 9, 2012, I spoke to Attorney Harris by telephone about the 5-to-10-year plea offer. Attorney Harris told me that he had discussed the proposed plea with Attorney Cleary and that they advised me to reject the proposal. Attorney Harris told me it was "a fake 10," meaning that if I pleaded guilty under the agreement, I would definitely receive the maximum sentence of 10 years. Attorney Harris also told me that if I were able pay a sufficient retainer for Proskauer to enter the case as counsel of record, he and Attorney Cleary would be able to negotiate a more favorable deal due to Attorney Cleary's influence as the former U.S. Attorney for New Jersey.

18. I followed the advice of Attorneys Cleary and Harris and did not accept the 5-to-10-year offer.

19. On December 3, 2012, I attended a hearing in my case. After the hearing, the prosecutors and my attorneys (Klingeman, Schoen, and Cominsky) went into Judge Pisano's chambers while I waited with my wife and others in another room. Following the meeting, my attorneys described for me a discussion with the judge about possibly restoring the earlier 5-to-10-year plea deal. They told me that Judge Pisano expressed a strong preference to see the case resolved by plea rather than trial. My attorneys said that during this discussion, the judge had put the prosecutors and defense counsel in different rooms and shuttled back and forth between them. They told me that the judge had suggested that the defense sign and

4

submit the earlier proposed 5-to-10-year plea agreement to the government, even though the deadline had passed. My attorneys also told me that the judge had said that, in 20 years on the bench, he had never seen an acquittal in his courtroom.

20. On December 5, 2012, I authorized my attorneys to submit a signed copy of the 5-to-10-year plea agreement to the U.S. Attorney's Office based on what they told me about the discussions with Judge Pisano two days earlier. However, the government refused to reinstate the expired offer.

21. On December 9, 2012, I met with Attorney Harris at his home in Queens, New York, to discuss raising a retainer of $1 million so that Proskauer could defend me at my upcoming trial.

22. In mid-December, I rejected two simultaneous plea offers from the government with sentencing ranges of 0-to-20-years and 10-to-15-years, respectively.

23. On December 20, 2012, I delivered a check for $1 million to Proskauer as a retainer for Attorneys Cleary and Harris to file appearances in court to represent me as trial counsel.

24. On January 1, 2013, Attorneys Cleary and Harris told me that recently disclosed discovery materials were damaging and that I should consider pleading guilty. But I insisted on going to trial.

25. On January 2, 2013, I arrived at Proskauer's offices in New York to work on trial preparation. When I arrived, however, Attorney Cleary told me he had just had a telephone conversation with Judge Pisano. He told me that Judge Pisano said that if I entered a guilty plea, "all doors will be open," but that if I were convicted at

5

trial, "all doors will be closed." In addition, Attorney Cleary told me that Judge Pisano assured him that he would "remember" the earlier 5-to-10-year plea offer and that I could be confident he would impose a sentence consistent with that offer if I entered a guilty plea.

26. In light of Judge Pisano's assurances, Attorneys Cleary and Harris advised me to accept a plea agreement that would include a sentencing range of 0-to-25-years in prison.

27. I discussed with Attorneys Cleary and Harris the coverage provision contained in the plea agreement and the need to obtain protection from any future prosecution for financial misconduct through the date of the plea. I specifically recall being advised by them that the plea agreement would cover me for any alleged fraud but not other types of crimes like "rape or murder."

28. I saw the proposed 0-to-25-year plea agreement itself for the first time at around 6 p.m. on January 2, 2013. Based on the advice of Attorneys Cleary and Harris, I accepted the agreement.

29. The next day, January 3, 2013, I entered my guilty plea in court.

30. But for Proskauer's advice and, specifically, what they told me about the call between Attorney Cleary and Judge Pisano, I would have gone to trial rather than accept the 0-to-25-year plea offer.

Signed under the pains and penalties of perjury on this 12th day of January 2018 at Lisbon, Ohio.

_____
Eliyahu Weinstein