UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

ELIYAHU WEINSTEIN,
  *Petitioner*,

v.

UNITED STATES,
  *Respondent*.

Civil Action No. _____

# DECLARATION OF DAVID SCHOEN, ESQ.

Pursuant to 28 U.S.C. § 1746, I, David Schoen, declare as follows:

1. I am a solo practitioner with more than 30 years of professional legal experience. In my practice, I focus primarily on complex criminal and civil litigation. I am a member in good standing of the bars in New York, Alabama, Maryland, and the District of Columbia.

2. In early September 2010, Eliyahu Weinstein contacted me about representing him in various legal matters, including a federal criminal case that was pending against him. *See United States v. Weinstein*, No. 10-mj-7115 (D.N.J.). At that time, Attorney Ephraim Savitt represented Mr. Weinstein, who had been released on conditions, including a $10,000,000 secured bond.

3. During our discussions in September and October 2010, Mr. Weinstein told me that he also hoped to retain Attorney Robert Cleary, of Proskauer Rose LLP ("Proskauer"). Attorney Cleary and his partner, Attorney Mark Harris, led Mr. Weinstein to believe that, as the former United States Attorney for New Jersey,

1

Attorney Cleary could influence the United States Attorney's Office ("USAO") to dismiss the criminal case or to resolve it on favorable terms.

4. On multiple occasions, I met in person and spoke by telephone with Mr. Weinstein, Attorney Cleary, and Attorney Harris, to discuss the criminal case and whether Proskauer and I would jointly represent Mr. Weinstein in that matter. But Mr. Weinstein was unable to retain Proskauer, because he lacked the funds to pay the substantial retainer that Proskauer demanded. Attorney Cleary spoke with the USAO about whether it would agree to release assets seized from Mr. Weinstein so that he could retain Proskauer, but the USAO would not agree to do so.

5. Shortly after Mr. Weinstein consulted with me, Attorney Cleary, and Attorney Harris about representing him, on October 14, 2010, Attorney Savitt moved to withdraw as counsel for Mr. Weinstein in the criminal case against him.

6. On December 9, 2010, the Court held a hearing concerning who would represent Mr. Weinstein (or whether he would proceed *pro se*). Before the hearing, Proskauer drafted and provided to Mr. Weinstein a "script" for a statement to the Court. The script, which Proskauer sent to me in advance, was as follows:

> Good afternoon, Judge Salas. I recognize that the Court directed me to resolve the matter of my representation by December 6[, 2010]. Since issues have arisen between me and Mr. Savitt, I have, for the past several months, been working hard to retain counsel. I, however, have been unable to do so because of the Government's seizures of, and restraints on, my assets.
>
> I have met with counsel, who is prepared to appear for me in this action, if I provide the necessary retainer payment. The counsel is Robert J. Cleary, the former United States Attorney in this District, who is a partner at Proskauer Rose LLP. But, because I have been unable to pay

> Proskauer's retainer, Mr. Cleary is not able to enter an appearance on my behalf today. I will be stuck in this position unless and until a portion of my restrained assets are freed up to enable me to pay Proskauer.
>
> I understand that Mr. Cleary has spoken to Assistant United States Attorney Mark Coyne, and explained to Mr. Coyne that Proskauer is prepared to appear for me, but only if money is released to pay Proskauer's retainer.

Attorney Harris explained to me, in an email, that this script only mentioned Attorney Cleary as possible counsel for Mr. Weinstein "so that it would not appear that Eli [Weinstein] was looking to hire a whole team of lawyers, and also because Bob [Cleary] will be known to the Court."

7. At the end of the hearing, the Court allowed Attorney Savitt to withdraw and appointed Attorney William Hunt, as CJA counsel, to represent Mr. Weinstein.

8. About one month later, on January 10, 2011, the Court relieved Attorney Hunt (who had a conflict because he represented an adverse client in another matter) and appointed Attorney Jean Barrett, as CJA counsel, to represent Mr. Weinstein.

9. Throughout this time, I continued to consult with Mr. Weinstein about the criminal case against him, and he continued to try to raise money to retain Attorney Cleary, Attorney Harris, and me.

10. Proskauer encouraged Mr. Weinstein to pursue various investment opportunities, and the firm provided legal advice about these transactions, including an investment in third-party life insurance policies and an investment in commercial property. The purpose of these transactions, some of which involved alleged victims in the case, was to enable Mr. Weinstein to generate funds to pay Proskauer, notwithstanding the conditions of Mr. Weinstein's release which expressly prohibited

3

Mr. Weinstein from having contact with any alleged victim or engaging in any "employment." Despite these efforts, Mr. Weinstein was not able to pay the retainer that Proskauer required.

11. On July 22, 2011, Attorney Henry Klingeman, of Krovatin Klingeman LLC, appeared as retained counsel on behalf of Mr. Weinstein and substituted for Attorney Barrett as CJA counsel. Mr. Weinstein told me that he wanted Attorney Klingeman, a former Assistant United States Attorney ("AUSA") in New Jersey, and me to serve as his co-defense counsel.

12. On August 24, 2011, Attorney Klingeman and I met with the USAO for a "reverse proffer." Mr. Weinstein attended the meeting, and FBI agents and IRS agents were also present. AUSA Erez Lieberman may have attended part of the meeting. AUSA Zach Intrater and AUSA Gurbir Grewal made a presentation that detailed the evidence concerning alleged frauds by Mr. Weinstein. At the end of the meeting, the prosecutors stated that the USAO intended to seek an indictment against Mr. Weinstein but that they were willing to discuss a possible negotiated resolution.

13. Attorney Cleary and Attorney Harris did not attend the reverse proffer, and they discouraged Attorney Klingeman and me from going forward with that meeting. At that time, Proskauer seemed primarily concerned with reaching an agreement with USAO about releasing a portion of Mr. Weinstein's seized assets so that he could pay legal fees.

14. Attorney Cleary and Attorney Harris advised Mr. Weinstein that the criminal case against him must be very weak, because it had been more than one year since the complaint was filed but no indictment had yet been obtained. Attorney Harris told Mr. Weinstein, "When they [the prosecutors] look on the wall" in the USAO, "they see Bob [Cleary]'s picture. And they will know that Bob knows that they have no case."

15. Around the time of the reverse proffer, I learned from Mr. Weinstein, who forwarded emails from Attorney Cleary and Attorney Harris, that Attorney Cleary had contacted AUSA Intrater, disclosed to the USAO that Mr. Weinstein had access to $500,000 from a real estate transaction in Israel, proposed that a third-party attorney "vet" those funds, and requested that the USAO permit Weinstein to use the funds to retain Proskauer. Based on those discussions with the USAO, Proskauer arranged to have Attorney Edward Dauber "vet" the transaction in Israel and the source of the $500,000 that had been wired to Proskauer.

16. On September 20, 2011, the USAO moved to revoke Mr. Weinstein's bail. The prosecutors alleged that Mr. Weinstein had violated the conditions of his release by proposing business transactions with alleged victims and engaging in on-going fraudulent activity.

17. The prosecutors had previously raised concerns with Attorney Klingeman, which he repeated to me, that the USAO had "sufficient evidence" to move for revocation and seek new charges against Mr. Weinstein based on his alleged illegal conduct since the filing of the criminal complaint, including that Mr. Weinstein

5

had allegedly "reach[ed] out to 'old victims' to make them whole using 'new frauds'" and that Mr. Weinstein had allegedly "us[ed] lawyers and lawyer offices as a cover to conduct these meetings," which the USAO believed "constitute[d] victim-witness tampering." The prosecutors reiterated those concerns in their written submission to the Court.

18. On September 23, 2011, I appeared in the criminal case as retained co-defense counsel for Mr. Weinstein, and along with Attorney Klingeman, I represented Mr. Weinstein in court on the USAO's motion to revoke Mr. Weinstein's bail.

19. In advance of that hearing, I advised Attorney Harris to be available as a potential witness in the event of an evidentiary hearing, because the prosecutors alleged that Mr. Weinstein violated the conditions of his release by meeting with Attorney Harris and alleged "victims" at Proskauer's office in New York to conduct business deals. On the phone, Attorney Harris seemed extremely nervous, agitated, and upset, and he made clear to me that he did not want to be called as a witness. At the hearing, Attorney Harris was present with his partner, Attorney Gregg Mashberg; his associate, Attorney Emily Stern; and another attorney from Proskauer. In the end, however, Attorney Harris did not testify. The Court continued the hearing until October 6, 2011, and by then, the parties agreed to modify Mr. Weinstein's release conditions. On October 18, 2011, the Court issued an order that modified Mr. Weinstein's conditions of release and required special counsel, Attorney John Azzarello, to approve certain financial transaction in excess of $1,000.

Around this time, Mr. Weinstein directed Proskauer to send to Attorney Klingeman the $500,000 that had been wired from Israel to Proskauer, so that the funds could be used to pay Attorney Klingeman and me, as defense counsel, as well as to pay investigators and to cover other expenses. Proskauer did not immediately comply with Mr. Weinstein's instructions. Only after extended discussions, Proskauer sent approximately $340,000 to Attorney Klingeman, but it kept $160,000 as payment for its legal fees. Attorney Klingeman returned the remainder of the funds to Israel.

20.   On October 27, 2011, a grand jury in the District of New Jersey returned a multi-count indictment against Mr. Weinstein and his co-defendant, Vladimir Siforov. *See United States v. Weinstein*, No. 3:11-cv-701 (JAP). The indictment alleged frauds against numerous victims and losses totaling approximately $200,000,000.

21.   For most of the following year, from late 2011 to late 2012, Attorney Klingeman and I worked together to review voluminous discovery materials, to investigate the many allegations against Mr. Weinstein, and to prepare to defend him at trial, if necessary. Meanwhile, Proskauer—particularly, Attorney Harris—stayed in close contact with Mr. Weinstein and encouraged him to try to raise sufficient funds to retain the firm as his primary defense counsel.

22.   On Monday, November 5, 2012, the USAO tendered a written plea offer to Mr. Weinstein. By its terms, the offer would remain open until Friday, November 9, 2012, and then, if not accepted, expire. Among other terms, the plea offer provided that, pursuant to Fed. R. Crim. P. 11(c)(1)(C), Mr. Weinstein would plead guilty to charges of wire fraud and money laundering, and he would be sentenced to between

5 and 10 years in prison, up to 3 years of supervised release, and restitution to specified victims in the amount of $14,750,609.

23. When I received the plea offer, on November 5, 2012, I promptly reviewed its terms and discussed them in detail with Attorney Klingeman. On November 6, 2012, I sent a copy to Mr. Weinstein. Later that day, I participated by phone in a meeting with Mr. Weinstein, Attorney Klingeman, and others about the 5-to-10-year plea offer. Over the next several days, we discussed specific provisions, including the scope of coverage for other criminal activity (i.e., conduct that was not alleged in the indictment), and we negotiated with the prosecutors to expand that coverage to better protect Mr. Weinstein from any future prosecution. Mr. Weinstein, Attorney Klingeman, his associate, Attorney Cominsky, and I also discussed a factual allocution that Mr. Weinstein could make in court as the basis for a guilty plea.

24. I strongly advised Mr. Weinstein that he should accept the 5-to-10-year plea offer, which I believed to be in his best interest, because it would limit his maximum sentence to 10 years in prison and, at the same time, allow Mr. Weinstein to argue for, and possibly receive, a minimum sentence of 5 years if he paid significant restitution to the victims of his offenses.

25. I know, from emails, calls, and meetings in which I participated, that Mr. Weinstein received the same advice—that is, to accept the 5-to-10-year plea offer in order to limit his potential sentence to, at most, 10 years—from several other people, including Attorney Klingeman, Attorney Cominsky, and Michael Burnbaum, an advisor to Mr. Weinstein.

8

26. As of Thursday, November 8, 2012, Mr. Weinstein had accepted the 5-to-10-year plea offer in principle, and he was considering a possible factual allocution for a guilty plea, but he had not yet decided whether to plead guilty. In connection with our ongoing discussions, Attorney Klingeman advised Mr. Weinstein that the USAO would not materially change the plea agreement, that it would be ready for trial on January 7, 2013, and that "the consequences of a guilty verdict will be include a prison sentence measured in decades."

27. On Friday, November 9, 2012, the USAO sent a revised plea agreement that reflected certain changes that we had negotiated to benefit Mr. Weinstein. By the end of the day, however, Mr. Weinstein had not yet decided whether to accept the plea offer, and at Attorney Klingeman's request, the USAO agreed to extend the deadline to the end of the day on Monday, November 12, 2012.

28. Over the weekend, I had additional discussions about the plea offer with Mr. Weinstein, who asked for a written assurance from the USAO that, if he paid significant restitution to his victims (e.g., paying back one-third of the victims' losses before sentencing), the prosecutors would recommend a sentence of 5 years (or close to 5 years) rather than 10 years. It was my understanding that, over the weekend, Mr. Weinstein also consulted with other individuals whom he trusted.

29. In the morning on Monday, November 12, 2012, at Mr. Weinstein's request, Attorney Klingeman and I spoke with the prosecutors, but they were not willing to provide any written assurance about their sentence recommendation.

30. Ultimately, by the end of the day, Mr. Weinstein did not accept the written plea offer from the USAO that would have limited his exposure to a maximum sentence of 10 years in prison and less than $15 million in restitution. Mr. Weinstein told me that he decided not to accept the plea offer, because despite our advice and the USAO's oral assurances about a favorable sentence recommendation based on significant restitution, Mr. Weinstein believed that, if he entered the plea agreement, he would receive a sentence of 10 years, the maximum sentence under the agreement.

31. After the deadline passed for Mr. Weinstein to accept the 5-to-10-year plea offer, on Monday, November 12, 2012, I continued to work, along with Attorney Klingeman, Attorney Cominsky, Mr. Burnbaum, and David Gannaway, a forensic accountant (and former IRS agent) who consulted on the case, in preparation for defending Mr. Weinstein at trial. We discussed setting up a war room in New Jersey and divided up responsibility for likely witnesses.

32. On November 30, 2012, the prosecutors advised defense counsel, through Attorney Cominsky, that the USAO planned to dismiss multiple counts of the indictment to "streamline" its case against Mr. Weinstein. On December 2, 2012, the USAO filed a revised indictment that omitted several substantive counts and that, as a result, significantly reduced the alleged losses to the identified victims from approximately $200,000,000 to less than $15,000,000.

33. On December 3, 2012, in the morning, I appeared in federal court in Trenton with Attorney Klingeman and Attorney Cominsky for a pre-trial hearing. Mr. Weinstein, his wife, and others were present. Judge Pisano heard argument on

10

pre-trial motions and addressed pre-trial matters. After the hearing, Judge Pisano asked Attorney Klingeman, Attorney Cominsky, and me as well as AUSA Intrater and AUSA Grewal to meet with him in chambers. The group discussed trial scheduling and other logistical matters.

34. At the end of the discussion in chambers, I advised Judge Pisano that I considered the inability to resolve the case by a plea agreement to have been a personal failure of mine. Immediately, Judge Pisano became more attentive and animated, and he asked whether a plea deal may be possible. I explained that on November 5, 2012, the USAO had made a written plea offer to Mr. Weinstein with a sentence range of 5 to 10 years in prison and less than $15 million in restitution; that Mr. Weinstein would now be willing to accept the offer with certain minor modifications; but that the USAO insisted its deadline of November 12, 2012, had passed and, thus, its offer had expired.

35. At that point, Judge Pisano asked defense counsel and the prosecutors to sit in separate rooms, and he shuttled back-and-forth between the rooms in an effort to facilitate plea negotiations. Judge Pisano expressed his strong preference that the parties resolve the case by a plea agreement, obviating the need for a long, complex, fraud trial. Judge Pisano invited the prosecutors to reinstate the earlier plea offer, but they were reluctant to do so. Then, he encouraged defense counsel to have Mr. Weinstein execute the 5-to-10-year plea offer and to submit it to the USAO for consideration. Judge Pisano also told Attorney Klingeman and me that, if we ran into trouble with the plea negotiations, he would be available and willing to help.

36. After the meeting in chambers with Judge Pisano and the prosecutors, Attorney Klingeman, Attorney Cominsky, and I recounted for Mr. Weinstein various statements that Judge Pisano had made, including that in 20 years on the bench, he had "never seen an acquittal" following a trial in his courtroom.

37. Around noon, Dana Sledge, Judge Pisano's courtroom deputy, contacted Attorney Klingeman; reported that she has received his "message" from Joanne Caruso, the court reporter, about a possible guilty plea; and advised that, "if [Mr. Weinstein] chooses to plead guilty to the indictment," the change-of-plea hearing would be scheduled for December 11, 2012.

38. Later in the afternoon, I met with Attorney Klingeman, Attorney Cominsky, Mr. Weinstein, and others to discuss whether Mr. Weinstein should accept the 5-to-10-year plea offer. Those discussions continued through December 4, 2012, and on December 5, 2012, in the morning, I spoke by telephone with Mr. Weinstein and his wife about his decision.

39. On December 5, 2012, around midday, Attorney Klingeman emailed Mr. Weinstein, Mr. Burnbaum, Mr. Gannaway, Attorney Cominsky and me, to let us know that AUSA Intrater called him to say, "the USAO, up to and including USA Paul Fishman, wishes [Mr. Weinstein] to know that the plea offer that expired on November 12 is not on offer and will not be offered again." Nevertheless, Attorney Klingeman, Attorney Cominsky, Mr. Burnbaum, and I advised Mr. Weinstein to send the executed plea agreement to the USAO in the hope that the prosecutors would reconsider and accept it.

40. In response, Mr. Weinstein told Attorney Klingeman, Attorney Cominsky, and me, that he regretted not accepting the 5-to-10-year plea offer from the government by the deadline, and that he had decided "to go forward with the plea agreement as we've discussed." Based on that authorization from Mr. Weinstein, Attorney Klingeman emailed to the USAO an executed plea agreement with several minor clarifications. But the USAO promptly rejected the "proposal" from Mr. Weinstein, insisting that its plea offer had expired on November 12, 2012.

41. Following those unsuccessful plea discussions with the USAO, which concluded by December 6, 2012, Attorney Klingeman, Attorney Cominsky, and I continued to prepare for trial, including by reviewing discovery, assigning responsibility for witnesses, and conducting further investigation.

42. On December 12, 2012, due to a breakdown in communication with Mr. Weinstein and a dispute over trial preparation and attorneys' fees, I moved to withdraw as counsel for Mr. Weinstein.

43. On December 13, 2012, the USAO tendered two plea offers with sentencing ranges from 0-to-20-years and 10-to-15-years, respectively. Notwithstanding my pending motion to withdraw, I discussed these offers with Mr. Weinstein and Attorney Klingeman. Neither I nor Attorney Klingeman advised Mr. Weinstein to accept either of those offers, and in the end, Mr. Weinstein rejected both offers. Mr. Weinstein made clear to us that he preferred to go to trial. In fact, Mr. Weinstein indicated that he felt more confident about a trial, because the government

had dropped several counts, significantly narrowed the scope of the indictment, and drastically reduced the amount of alleged losses.

44. On December 19, 2012, the Court granted my motion to withdraw, and my representation of Mr. Weinstein ended.

45. I later learned that, a few days after I withdrew, Mr. Weinstein paid a retainer of $1,000,000 to Proskauer and engaged Attorneys Cleary and Harris to represent him as trial counsel. I also learned that, although Attorney Klingeman remained counsel of record, Proskauer effectively excluded him from the defense team and did not plan for him to play an active role at trial.

46. In late December 2012 and early January 2013, I was not involved in any plea negotiations between the USAO and Attorney Cleary, Attorney Harris, and/or Attorney Klingeman.

47. On January 2, 2013, the USAO tendered a written plea offer to Mr. Weinstein. Among other terms, the plea offer provided that, pursuant to Fed. R. Crim. P. 11(c)(1)(C), Mr. Weinstein would plead guilty to charges of wire fraud and money laundering, and he would be sentenced to between 0 and 25 years in prison, up to 3 years of supervised release, and "full restitution" based on a "full accounting" of losses that the alleged victims had suffered. Because I was no longer counsel to Mr. Weinstein, I did not advise him about whether to accept the 0-to-25-year plea offer.

48. I was told by Mr. Weinstein and Attorney Klingeman that, shortly before midnight on January 2, 2013, and based on advice from Attorney Cleary and Attorney Harris, Mr. Weinstein accepted the 0-to-25-year plea offer.

49. In the morning on January 3, 2013, Mr. Weinstein pleaded guilty. Attorney Cleary and Attorney Harris represented Mr. Weinstein at the plea hearing, and Attorney Klingeman was also present. Because I was no longer counsel for Mr. Weinstein, I did not appear the plea hearing.

50. On January 4, 2013, only two days after Mr. Weinstein accepted the 0-to-25-year offer and one day after he pleaded guilty to several counts of the indictment, I spoke by telephone with Attorney Klingeman.

51. During the call, Attorney Klingeman told me that, before the plea hearing on January 3, 2013, he met with Mr. Weinstein, Attorney Cleary, and others in the cafeteria of the federal courthouse in Trenton. According to Attorney Klingeman, Attorney Cleary told the group in the cafeteria that, on January 2, 2013, he and Judge Pisano had spoken by phone to discuss a possible guilty plea by Mr. Weinstein and that Judge Pisano told Attorney Cleary, if Mr. Weinstein pleaded guilty, Judge Pisano would "remember" the USAO's 5-to-10-year plea offer and impose a sentence of between 5 and 10 years (or even less), consistent with that earlier offer.

52. Attorney Klingeman and I discussed the risk that Attorney Cleary could cause problems for Mr. Weinstein (and himself) if it became publicly known that he had spoken with Judge Pisano about the terms and consequences of a possible guilty plea by Mr. Weinstein. I recall that specific discussion, because Attorney Klingeman and I talked about a related federal case, *United States v. Davila*, in which the U.S. Supreme Court had granted certiorari, earlier that same day, to address the

15

consequences of improper judicial involvement in plea negotiations. We discussed that Attorney Cleary's comments about his inappropriate, *ex parte* communications with Judge Pisano—and Judge Pisano's assurances about Mr. Weinstein's sentence—were reckless and could give rise to a § 2255 petition in the future.

\* \* \*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, belief, and recollection.

_____
David Schoen

Executed on January 16, 2018